We'll get to that in a moment. You may proceed. Thank you very much. Good afternoon. Steve Kupperman for W & T Offshore. In this case, Your Honors, an operator used its majority interest to bully its minority non-operator in bad faith. Because the terms of the operating agreement between the parties unequivocally prescribed Apache's actions, the case never should have been tried. When it was tried, however, the jury's finding confirmed that Apache acted in bad faith and therefore was not really entitled to $43 million that the district court awarded it. Each of these issues merits reversal, and I'd like to start first with the JOA, the contract itself. Section 6.2 of the joint operating agreement resolves the case, I believe, as a matter of law. Section 6.2 says Apache cannot spend more than $200,000 without an approved AFE, and a short payment is okay if there is no approved AFE. The lower court found that Section 6.2 creates no exemption for a government-required P&A, and the contract, quote, as a whole, reflects that if the parties intended to exempt an operation from the contract provision, they would have done so explicitly, and they didn't do so here. The contract also said — I'm sorry, the court also said that interpreting the contract so as to give effect to 6.2, even if the P&A is government-mandated, comports with the contract's clear and explicit language, and that interpreting 6.2 to apply when a P&A is government-mandated comports with the contract's — excuse me — comports with the contract's plain language and is a reasonable interpretation producing the non-operator, close quote. The court was absolutely correct on all those findings. It just reached an incorrect result. Despite the clear and explicit language, the court ultimately held that giving credence to 6.2 would allow the non-operator to prevent a P&A when the government-mandated, which it deemed an absurd consequence. It allowed the jury, therefore, to decide on the construction of the JOA, even though it found no ambiguity in the contract or the contractual language. I will say that there is no absurd consequence. Section 6.2 exists to produce the — Kennedy. If there is ambiguity, the jury answered it, didn't it? Sotomayor. I'm sorry, Your Honor. Kennedy. If there was ambiguity, the application of 6.2 and 18, it went to the jury. Sotomayor. If there was ambiguity, it went to the jury. That is correct, Your Honor. However, I don't believe there is any ambiguity because, and I'll explain, 6.2 exists to protect the non-operator of the will. And in fact, by the way, Judge Higginbotham, the district court found there was no ambiguity in that. It just said it led to absurd consequences. It said it was clear and explicit language, and it was reasonable language. Now, 6.2 exists to protect the non-operator of the will, who's often a minority owner, like W&T, from being bullied by the majority owner, like Apache. Without it, an operator unilaterally could contract for any amount using any equipment, and according to Apache, the non-operator would have no say in the matter, yet still would have to pay. This permits the more financially solid majority operator, Apache here, to force a minority non-operator to expend more than it should. It could harm the non-operator's financial stature and even drive it into bankruptcy or force it to provide or turn over some producing properties in lieu of payment. An operator generally has two tasks that require substantial expenditures, drilling a well and plugging that well. 6.2 is intended to act as a governor on the operator's actions regarding those tasks. Apache's view of Section 6.2 effectively deprives the non-operator of the protection of the section and doesn't give the non-operator the benefit of the provision he bargained for. But only to the extent that they're complying with the government rule. With the government rule, but here they did not. And I will explain, Your Honor. My suggestion is that you contract against the available law, and one of the part of the available law here is that you have to comply with the safety requirements. And the government rules here. I agree from what I heard, Your Honor. But Section 18.4, which is the one that Apache relies on, merely sets forth who pays the costs once the costs are determined. Now, W&T doesn't contest it, owes costs properly assessed under the given way. In fact, W&T already has paid Apache the amount of money that would have been owed had the Helix, the intervention vessel, been used. In contrast to 18.4, which just says who pays, 6.2 governs how costs are determined and who determines them. That's the crux of the issue here, and 6.2 applies. Now, to the extent that there is any dispute as to cost, the contract itself requires mediation to resolve disputes, and there's always declaratory judgment actions in advance of the expenditure. As a last resort, the federal law allows the government to perform the P&A and then have the owners pay. I believe we may have given you some incorrect sites in the brief, so I'd like to correct that. 30 CFR 250.1715 sets forth the occasions when a P&A is government mandated. 30 CFR 556.907 states that if the owners do not P&A, the government can do so and the owners will be assessed the money. That's a backstop that ensures the well is P&A'd when required. It also serves as an incentive for operators and non-operators to reach agreement before the government steps in, and that's why there's a mediation clause in the agreement to resolve issues before suits filed. Here, Apache never attempted to mediate, and the government, in fact, never stepped in to this. Now, 6.2 requires a signed AFE. Apache admits it failed to obtain a signed AFE. That should end the matter, because with an Apache breach, there's no reason to go to Article 2003.1, that first provision of it, because whether 2003 requires a breach or not, there would have been a breach under 6.2. Basically, the district court should have made the determination that 6.2 prevails, which in and of itself requires Apache to get an approved AFE. It did not do that. It sent the matter to the jury, but as a matter of law, it is clear. And in fact, the district court, as I said, held it was clear and explicit and there was no ambiguity. It should not have gone to the jury, and that should resolve the matter. But let me move, if I can now, to my second issue, which is Section 2003. The jury's answer to Question 4 unequivocally found that Apache acted in bad faith, thereby causing W&T not to comply with the contract. That's an incredibly important finding. Where a plaintiff, as a matter of fact, has caused the defendant to breach a contract, there's no theory under the Louisiana Civil Code by which a plaintiff can recover full damages. To understand this, I think it's important to understand the structure of the Civil Code on damages, which is why I have the chart. The Code has a very well-thought-out symmetry that treats the parties causing a breach similarly regardless of who the breaching party is or whether it was a non-breaching party that caused the breaching party to breach. As you can see from the demonstrative, the amount of recoverable damages actually depends on who was at fault, not who breached. All this, by the way, is found in the Civil Code Title on Contracts, Chapter 8, Section 4, which sets forth the recoverable damages in Louisiana. Where the party that breached the contract is at fault, that's the left side of this chart, the Code treats the breach for negligence different than it treats the breach for bad faith. If the breach is for negligence, there's a limitation of recovery. You can only get foreseeable damages. But if the breach is in bad faith, there's no limit to recovery, and the plaintiff can recover because of the bad faith fault of the breaching party, the plaintiff can recover all damages, foreseeable or not. Those are Articles 1996 and 1997 in the Civil Code. Now let's flip to the other side. This is where the non-breaching party causes the other party to breach. And that's what the jury found here with regard to Apache in Question 4. Here the Code treats negligence and bad faith as the mirror image on the other side of this chart. If Apache's negligence caused W&T to breach, the second paragraph of Article 2003 limits Apache's recovery to comparative fault. If Apache's bad faith, however, caused W&T to breach, and that's what the jury found in Question 4, the flip side of recovering all damages over here is the recovery of no damages over here. So effectively, that's what the jury found, and this should be the W&T issue, no damages. I don't see Lamar on your chart. Lamar is not on the chart, and that is because, one, Lamar did not deal, in the least, with bad faith. The issue in Lamar, and in fact, Lamar says it twice in the opinion, is that the sole issue, the sole assignment of error and the sole issue presented was that of negligence, not bad faith. Now, I do have issues with Lamar, but I think the Lamar court, I think it was incorrectly decided, but I know that's not what we're discussing here. But I do think that Lamar does not address the issue in front of this court. And in fact, if you do look at Lamar, it relies on Hulse, which never said that a breach was required. It just said an act in bad faith. It happened there to be a breach, but it didn't require a breach. And Favreau — I'm sorry, Your Honor. I thought it said quite clearly that the general contractor there was not in breach, and because it was a payment the owner had not yet paid him under their contract that he was not obligated yet to pay. And the fact that they didn't cooperate with the subcontractor was of no moment. The subcontractor, waiting for more help, said he needed the money to finish out the job and they wouldn't give it to him, but they said there was no breach of contract, period. All right. There's no bad faith and no breach of contract. In fact, when you look at the case carefully, what it really says is that Lamar, the contractor, did not cause the breach of the contract at all by the subcontractor. I don't even think you need to get to the ultimate issue of was it negligence or was it bad faith, because the Court actually found Lamar didn't cause the breach by the contractor, the subcontractor. That was the subcontractor itself. But even granting, even if you are correct in the interpretation — Why shouldn't we certify this to Louisiana Supreme Court? Pardon? Why shouldn't we just certify this to Louisiana Supreme Court and let them decide? I think that's an absolute — Thank you and adjourn. Pardon? No, I think that's not a bad idea. And, Your Honor, I do think — I want to cover a couple of things real quickly before I lose my time here, but Apache's interpretation of Article 2003-1, that W&T can only obtain relief if Apache first breached the contract, I think destroys the entire symmetry of this and it really renders Article 2003 unnecessary, because if Apache breaches in bad faith — Now, remember, what they're saying is Apache has to have breached first. If Apache breaches in bad faith, it's the breaching party at fault. Any problems are subsumed here on the left side. There's no need to impose a breach over here for bad faith this way. That's already going to be taken care of right here. So I think it destroys that entire symmetry and renders 2003-1, the provision we're talking about, meaningless. I'd also like to bring to your attention Sidi Ahoma v. Sewell, which is cited in both of W&T's briefs, and which Apache totally ignores and never even mentions in its brief. In Sewell, the Court found that the contractor's breach of contract was caused by the bad faith of the city. It cited in quoted Article 2003-1, the Court noted the city could not recover when its own bad faith caused the contractor's failure to perform. There was never any finding that the city breached any contractual obligation, but recovery was still barred. And that was because of the bad faith. I know there is an example that I have given you just for a practical matter in the brief, which is the homeowner and the painter. I'd like to bring your attention to another case, Boullée v. LeBlanc, which is an old Louisiana case from 1935. It's 159 Southern 623. Plaintiff entered into a contract with a farmer to take care of the cattle, the plaintiff's cattle on the farmer's land. The farmer accessed the land through a road that was controlled by the plaintiff after signing the contract. The plaintiff barred the farmer from using the road. And then he sued the farmer for breach of contract because he couldn't take care of the cattle. The Court there held that the plaintiff couldn't recover because the plaintiff himself had made fulfillment of the contract more difficult. Your Honor, in my last ten seconds, I'd also just like to point out that I think the 43 million should be reduced to the 26 million on the basis of the Louisiana law that holds that damages never can exceed the actual damage. The actual extent of damages truly suffered. Thank you. Thank you. May it please the Court. My name is Jeff Harrison. I represent Apache. WT and its predecessors made $250 million from their 49% interest in these wells. And then, as the jury found in Question 1, when the government required that these wells be abandoned, WT breached the contract and refused to pay its 49% share of the actual costs. The trial focused on the reasonableness of Apache's decision to use industry-stranded rigs and the question of whether WT's preferred vessel could have done the work at all or could have done it in a less expensive fashion. The jury found in Question 1 that a — There it was. you had to do operations open water, and Bessie would not allow that. That was the evidence. The jury found in Question 1 that Apache complied with its obligation to use reasonably necessary equipment, complied with its obligation to act prudently and as would a reasonable operator, and in Question 2 awarded $43.2 million. WT does not challenge those findings. I'd like to discuss why this Court should affirm the district judge's decision that the contract was ambiguous and that the bad faith and offset questions are of no legal consequence under Louisiana law. First, Judge Hittner expressly found, and I quote, explicit language of the contract does not resolve the party's intent. The parties have advanced two reasonable interpretations. Quote, the contract is ambiguous. And, quote, Apache's interpretation avoids the potentially absurd result of allowing the nonoperator to avoid its contractual obligations under Section 18.4. That's in the record that Your Honor has at 2962, 2966 to 67. The jury agreed with further showing Apache's interpretation is reasonable and, remarkably, WT does not challenge the jury's finding in Question 3 that Apache's interpretation is right. The only other Federal judge to consider this issue, Judge Susie Morgan, just across the street in the shell any case, likewise found this kind of contractual interplay between a general expenditure provision and a specific government-required P&A provision is ambiguous. WT's own executives at trial admitted, please look at record 63, 69 to 70, that WT is not trying to use Section 6.2 as an excuse for its failure to pay and does not dispute its liability to pay its share of the P&A costs based on its refusal to sign an AFE. Counsel opposite suggests that Section 6.2 is necessary to protect the nonoperator's interest. That's inaccurate. Section 5.1, with which Apache is found to have complied, requires that Apache use reasonable equipment, reasonably necessary equipment expressly including rigs. Apache complied. That protects the nonoperator. Section 5.2, with which Apache complied, requires Apache to act in a good and workmanlike manner and prudently. Apache complied. That protects the nonoperator, and the nonoperator is also protected by audit rights. And here, WT did audit Apache's P&A costs and did not in that audit challenge the use of the rigs or the expense. The notion that a government fail-safe coming in is the right way to go here flies in the face of the notion that a prudent operator cannot violate the law. The provisions that counsel cited, they were incorrect in the brief, deal with a financial insolvency problem. That's not what we have here. What we have here is an unwilling payer. Apache is actually out of pocket and paid the money. Lamar Contractors in Question 4 on bad faith. Let me ask you a question. When in the process of along the road contracting did the issue of the helix not be acceptable that you're going to have to move to this other equipment because of the deep hazards and so forth? Parties were arguing about that early on, but when in the course of this did that happen? Sure. Apache, the evidence shows that Apache contracted in the first place for the helix 534 after the failed plugging and abandonment attempt in 2012 with another intervention vessel, the Uncle John. In order to move off the well, to let Bessie have us move off the well and get an extension, we had to have another rig. Apache signed what the evidence shows was a low cancellation cost, easy to cancel, only three days of cancellation rate, rig, the helix 534, which didn't even exist at the time. It was halfway around the world being retrofitted in Singapore in order to get off the well. And WTCOO record site 6390 admitted that Apache was open and honest with helix about the contract's purpose being to get off the well. So when did we change? We changed when it was time to do the P&A work and our engineers re-evaluated in the post-Deepwater Horizon world with Bessie's regulatory enforcement increasing and increasing. And the Bessie regulation enforcement that no longer allowed open water work, which the helix had to do. Because we couldn't use the helix, we had to switch. That was the engineering decision that was made. And the low-cost cancellation contract testimony is at record 4659, Your Honor. Two years ago in Lamar Contractors, the Louisiana Supreme Court held that bad faith is, quote, not relevant without a breach of contract under Article 2003. And Article 2003 only applies if the obligee here, Apache, breached the contract. WT does not like Lamar. To his credit, counsel opposite admits they think Lamar was wrongly decided and want this court to do something different from the Louisiana Supreme Court. But the Louisiana Supreme Court is the ultimate authority and interprets the code and what the meaning of Louisiana law is. The Louisiana Supreme Court held that in the Sultana case in 2003. The Louisiana Supreme Court held this court is the ultimate arbiter of the meaning of the laws of this State in the first national bank case in 2012. The Louisiana legislature in the past has changed or clarified the law in the 2003 case in a groundwater use case. Here, the Louisiana legislature met multiple times in 2017 and 2018 after the 2016 decision of Lamar and did not change Lamar. In Boyette v. Redland, a panel of this court, coincidentally, all three Louisiana educated and practicing lawyers, Judges Weiner, Davis, and Chief Stewart, decided that this court, the Fifth Circuit, follows a two-step process for determining Louisiana law. First, quote. It used to be a three-step process. The first one would be to consult Al Tate. The dance moves have been simplified, Your Honor. First, we look to the decisions of the State's highest court, here the Louisiana Supreme Court, period, end quote, and for us, with Lamar, period, end quote. But second, if there is no Supreme Court decision from Louisiana on the decision, then this court makes its eerie guess using civilian methodology. We don't get here. This court confirmed that approach in 2015 and 2016 in the Angus chemical and alcohol. We look to the final decisions of the Louisiana Supreme Court, end quote. Article 2003 does not expressly mention a breach requirement in either the second sentence about negligence or the first sentence about bad faith. Lamar's analysis applies equally to both, and it doesn't differentiate. In fact, the analytical foundation for the Louisiana Supreme Court's decision in Lamar derives from good faith versus bad faith law, not good faith or bad faith versus negligence. That is not the analysis. That's why the Court says at page 398 of its decision, quote, taken as a whole, these authorities support the proposition that an obligor cannot establish an obligee has contributed to the obligor's failure to perform unless the obligor can prove the obligee itself failed to perform duties owed under the contract. W.T. tried to prove that. Apache breached, and it failed. The jury affirmatively found Apache complied. Now, Judge Hittner, in his decision, particularly record 3759-62, held that Lamar's holding turned on the interplay between good faith and bad faith and that the decision, quote, interprets Article 2003 globally. W.T. twice acknowledged in this case, before it lost at trial, that Article 2003 requires a breach of contract by the obligee Apache. First, W.T. admitted a breach was necessary in its Rule 50A JMOL motion. We cite that at our response brief, page 20. Second, W.T. itself tendered a definition at the charge conference for its bad faith question, record 3329. W.T.'s own tender showed, quote, bad faith is a designed breach of contract from some motive or interest of ill will, period, end quote. Apache agreed at the charge conference that bad faith must be defined for the jury, and after I agreed, W.T. told the judge we don't want any definition. And because this was W.T.'s question, the judge submitted it without any definition. That's record 6490. W.T.'s counsel points to two sentences in Lamar that say the negligence prong is the sole issue presented. I'm afraid that's misleading. Please look at footnote 5 of the opinion, because there Lamar makes very clear that the sole issue sentence applies to the assignment of error that the Louisiana Supreme Court granted in granting cert, as distinguished from, quote, additional assignments of error about attorney's fees and a separate increase in damages. We know that bad faith finding here, undefined and unpredicated at W.T.'s behest, we know that it has nothing to do with a breach of contract. How do we know that? Two ways. First, the jury did not find that Apache breached, and in fact, to the question 1, that all contracts must be performed in good faith. We know that, secondly, because W.T. at record site 6489 at the charge conference said of question 4 on bad faith, and I quote, it has nothing to do with any kind of prior breach of the contract. This was some free-floating, undefined bad faith that as a matter of Louisiana law is without legal consequence, which is why W.T. wants this Court to change the law. Last point here. W.T. says city of Houma. This is a Louisiana appeals court from 1987 in which the city did not even file an appellate brief. W.T. says we didn't talk about it. Well, Lamar doesn't cite it either, but I will talk about it. W.T. incorrectly says that there's no finding of breach. That's wrong. The Court expressly notes that the city did not comply with its contractual obligation under Article 2.3 to allow work to commence by July 6, delayed work by 27 days until August 2, and gave the contractor only four days to complete the project, which, by the way, W.T. misdescribes as building a power plant. It's actually building a fence and a gate. City of Houma is of no help to W.T. Last point, damages, $17 million reduction. The jury found in question 2 that Apache suffered $43.2 million in compensatory damages. W.T. itself tendered the question that Judge Hittner gave, and that question was defined with instructions straight out of Article 1995 from the Louisiana Code. That's Record 2801. W.T.'s expert confirmed to the penny the amount of damages. That's Record 6179. W.T. does not appeal the $43.2 million finding in question 2. W.T. comes here and argues that the damages are, quote, excessive based on this finding, again undefined, uninstructed, about a $17 million offset. This Court reviews that for abuse of discretion, and Judge Hittner did not abuse his discretion, and W.T. does not engage in any of Judge Hittner's explanation. W.T. appears to have abandoned any possible legal basis that it once trotted out to give effect to the $17 million offset. It abandoned mitigation, Record 2624. It abandoned setoff and compensation, Record 3683 to 85. It admits, quote, question 5 is not predicated on question 4 about bad faith, and there is no linkage between them. That's Record 3683. W.T. admits offset is, quote, separate and apart from the applicability of Article 2003. That's Record 3819. W.T.'s sole argument in its reply is what it calls basic legal principles, and what it cites is Article 1995. Well, Judge Hittner instructed the jury on Article 1995 in question 2, and W.T. doesn't challenge that. It tendered the question. As Judge Hittner explained in denying W.T.'s motion for the jury was not instructed to calculate harm by combining its answers to question 2 and 5, period, end quote. W.T. argued in closing argument that the jury should subtract from its answer to question 2 any notion of offsetting benefits, and the jury didn't do so. Now, W.T. is trying to wordsmith around a real problem it has with W.T. and says there is no reduction in damages or offset based on unjust enrichment. W.T.'s argument at the charge conference and in closing, and even in its brief, is all about unjust enrichment. But W.T. lays it bare at Record Cite 3820, where W.T. wrote, quote, the jury's finding of a $17 million offset was based on evidence that Apache enriched itself by using the drilling rigs for its own economic benefit, period, end quote. There is no legal basis for an offset here. That's Louisiana Code Article 2298. That's this Court's 2004 decision in Drs. Berthea v. St. Paul. In this case, W.T. does not respond to the overwhelming evidence that occupied the bulk of trial, and that was the Helix 534 vessel could not have done the work at all, Bessie would not have allowed it, and if it had, it wouldn't have done the work cheaper. W.T.'s partial payment here was based on what W.T.'s corporate representative and vice president of drilling, David Bump, admitted at trial, Record Cite 5658, was, quote, unrealistic assumptions about a trouble-free, without delay, abandonment operation using this vessel Bessie would not have allowed. This is serious business in the real world, where the operator is charged with environmental protection and safely abandoning wells when they stop producing. Apache did that work safely. These were high-risk, dangerous wells, the evidence shows. Apache fulfilled its obligation. It did a service to itself, to W.T., the nonoperator, and to all of us, and it should get paid the money it is out of pocket. There is no reason to certify a question to the Supreme Court of Louisiana here. It has been addressed. Thank you. Thank you, counsel. Rebuttal. Yes, Your Honor. Now, you started off with the argument that the jury found that all of this was reasonably necessary, and I think that the implication in that is that, therefore, there could not have been bad faith. However, there clearly was bad faith and the jury so found bad faith by Apache. And in fact, I will tell you, Leo Benitez, who was Apache's own drilling manager, said that Apache thought, when it contracted for Helix originally in 2012, that well casings needed to be cut and pulled. By the way, it's not open water work, just anything in the open water, that Bessie says you can't use the intervention vessel for. You can use it for anything. You just, they don't want you using it. After Deepwater Horizon explosion, they don't want you using it to cut and pull a well cap. That was not needed here. There was no cutting and pulling of the well cap, of the casings. But even so, 2012, when Apache initially contracted for the Helix, was two years after the Deepwater Horizon. They must have thought that the Helix could do the job or they wouldn't have contracted for it. The other thing is, is that afterwards, Apache now claims Helix couldn't do the P&A and refused to use it. However, in mid-2015, a few months after this well cap issue, this plugging and abandonment, Apache contacted Helix to P&A another open water well. And that's in the record at 8416. If Apache really believed Helix was incapable of the P&A work on subsea wells, it wouldn't have contacted Helix to P&A a similar well just a few months later. Now, Apache's own expert, Mr. Labiche, and this is at record 4810 and 11, said there were other Bessie-approved approaches by which Helix could have accomplished the P&A. And since Apache goes and talks about David Bump, who is W&T's VP of drilling, I will tell you that Mr. Bump, at the record at 5531.32, said the use of the rigs was expected to double the cost of the project. In fact, it tripled it. He said that under 5531.32, again, Apache never gave technical evaluations of reported problems by using the Helix, despite having told us that they had those reports and despite repeated requests from W&T. As it turns out, the fact showed they never had the reports. The jury easily could have found bad faith on that. Mr. Bump also said that Helix was capable of performing the P&A here, and that the only justification for using the rigs that W&T was ever provided is that Apache had them under contract. Those are pages 5543 to 45. Now, we have been told that, in fact, with regard to Lamar, for example, that I misstated because I said the sole assignment of error, and that there were other assignments added later. But what was not pointed out to you is not in a footnote, but actually in the text, what the Louisiana Supreme Court says is the sole issue presented for our consideration in Lamar is whether the district court erred in reducing Lamar's damages for breach of contract based on a finding Lamar's negligence contributed to Keiko's breach of contract. This is not an issue of bad faith. And whether the Louisiana Supreme Court or the civil code is the last arbiter of Louisiana law, Lamar didn't deal with this particular provision of the code, and there is no Louisiana Supreme Court case right on point. Counsel has talked about sections 5-1 and 5-2. They don't determine costs or determine who has — who pays for the costs. That's 6-2. They want to read 6-2 out of the contract. And finally, with the damages reduction, it's undisputed Apache saved stacking costs. The jury found that the full cost to W&T to P&A the well was $43 million. That was question 2. It then determined that should be reduced by $17 million. That was question 5. That's what the jury was asked, and that's what it found. I think as a practical matter, that's where it was going. You have to reduce at the minimum. Thank you, Your Honors. Thank you, counsel. The Court will take this matter under advisement.